NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 260205-U

NO. 4-26-0205

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 19, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| EMERSON EVANS, | ) | No. 25CF998 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Amy McFarland, |
| | ) | J. Jason Chambers, |
| | ) | Judges Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Knecht and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The appellate court affirmed the trial court's order granting the State's petition to deny defendant pretrial release, as the State proved by clear and convincing evidence that (1) defendant posed a real and present threat to the safety of any person or the community and (2) no condition or combination of conditions could mitigate that threat.

¶ 2   Defendant, Emerson Evans, appeals an order denying his motion for relief after the trial court granted the State's petition to deny him pretrial release pursuant to article 110 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 110 (West 2024)), hereinafter as amended by Public Act 101-652, § 10-255 (eff. Jan. 1, 2023), commonly known as the Pretrial Fairness Act. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4   On August 25, 2025, the State charged defendant by information with two counts

of intentional homicide of an unborn child (720 ILCS 5/9-1.2(a)(1), (2) (West 2024)) for administering mifepristone to T.R., thereby causing the death of her unborn child, knowing that T.R. was pregnant and that his acts created a strong probability of death to the unborn child. On the same day, the State filed a petition to deny defendant pretrial release on the basis that he posed a real and present threat to the safety of any person or persons or the community.

¶ 5          The trial court, Judge Amy McFarland presiding, held a hearing on the State's petition on August 25, 2025. The parties proceeded by proffer. The State proffered the following:

"[O]n August 22nd, 2025, the Bloomington Police Department responded to an apartment on RT Dunn Drive shortly before 5:00 p.m. for what turned out to be an investigation and eventual arrest for intentional homicide of an unborn child.

When the initial officer arrived, he met with the female victim, T.R., who was sitting on the edge of the bathtub crying. The officer noted large amounts of what appeared to be blood in the toilet as well as a dark object in the toilet, which the officer suspected to be a human fetus. The officer also observed three polygon-shaped pills covered in what appeared to be blood lying on the left side of the toilet seat.

The victim, whose initials are T.R., told the officer that she was approximately seven weeks pregnant, that her baby's fetus was in the toilet. She stated she found the three pills which she believed were placed in her vaginal area by her boyfriend without her consent or knowledge.

T.R. stated that she had just been to the doctor on August 20th, 2025, being two days before, where the medical report was that everything was fine and nothing was wrong with the fetus during that check up. She stated that on that day her

- 2 -

boyfriend, the defendant, and she were engaging in sexual intercourse *** when he wanted to try something new, quote, down there. She believes that he must have placed the pills in her during intercourse. It was earlier in the morning, and he asked to perform oral sex on her, which she said was unusual because he did not normally do that. She said later that day she started experiencing severe bleeding and cramping, which she initially attributed to the smoothies he had bought her.

T.R. denied ever getting a prescription for abortion pills, and stated that she did not wish to terminate the pregnancy. T.R. told the officer that when she informed the defendant of the pregnancy, he wanted her to terminate the pregnancy. Officers spoke to other witnesses familiar with the defendant, who were aware that the defendant wished for her to terminate the pregnancy. Using the pill finder, the officers were able to identify the pills as mifepristone, M-I-F-E-P-R-I-S-T-O-N-E, commonly known as the abortion pill.

Later that evening, on August 22nd, 2025, detectives spoke with the defendant, who initially denied doing anything to T.R. or to the pregnancy. When prompted with information that detectives had as during the course of their investigation, the defendant eventually admitted to putting the pills inside of her vagina, but *** tried to claim that T.R. knew about it and that he had just helped, quote, make the decision for her. When asked why he thought she knew, he stated that the pills fell out of her vagina a couple of times while they were having sexual intercourse. The defendant stated he paid $50 to a girl on campus to obtain the abortion pills."

The prosecutor continued:

"When officers did speak to the defendant and asked him when he was admitting to inserting pills in her, they asked him how many pills he had obtained, and he had said four. There was three that was discharged from the victim.

And, Your Honor, just doing an online search from mayoclinic.org, I would proffer that the mifepristone, the drug, that there are about 40 different medications that can have possible interactions or side effects with it. And according to the Mayo Clinic online, that the proper use is to take one tablet orally and then to take four tablets of misoprostol, another medication.

And among the potential side effects, there's a lot, but usually it's considered—some potential side effects would include cardiac arrest, and dizziness, confusion, lightheadedness, faintness, rapid heartbeat, as well as severe cramping and bleeding."

The State added, "[W]hen the victim was asked the danger assessment questions, she answered yes to one question, do you believe the defendant was capable of killing you? Yes."

¶ 6        At the State's request, the trial court took judicial notice of the pretrial investigation report. The State noted that defendant had one prior charge which did not appear in the report, a misdemeanor driving under the influence (DUI) charge, "because it was a court supervision that was dismissed in July of 2025." The report stated that defendant resided in Normal, Illinois, with his girlfriend and three of his four children. He was employed as a tire builder at Bridgestone in Bloomington, Illinois, and additionally coached youth football in the community. The report indicated that defendant did not have a history of drug abuse, mental health issues, or medical health issues. On the Virginia Pretrial Risk Assessment Instrument-Revised, defendant scored a 0 out of 14 points. He had no criminal history.

¶ 7    In addition to the information in the pretrial services report, defendant proffered:

"[T]he DUI case referenced by the State was dismissed after a term of court supervision that [defendant] successfully completed. And thus, that's the reason for that dismissal. I would also like to proffer that both parties researched family planning methods before this alleged incident, sometimes together and sometimes separately. Defendant's phone was confiscated from him by police. That would be able to substantiate that."

In response to that proffer, the State added:

"Speaking to the victim, she indicated that she did research possible (indiscernible) and also other medications online using her phone at—basically, that she said to get the defendant to basically shut up; that she never intended to terminate the pregnancy; that she wanted the infant child; that she has another infant child; and that she absolutely did not want to terminate the pregnancy and had no knowledge."

¶ 8    During argument, the State emphasized that "defendant initially lied to officers and said that he had no idea, that he didn't interfere with the pregnancy at all," but then "eventually he admitted to inserting [the pills] during intercourse." The State argued that if T.R. intended to terminate the pregnancy, she would not have inserted the pills during intercourse but would have taken them orally, as prescribed, and would have gone to a clinic to ensure that the medication would not interact with any other medications. The State further contended that no conditions could mitigate the threat posed by defendant because his conduct reflected "such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders, or even societal norms regarding the safety of others, if the defendant is placed on pretrial release." The State also emphasized that defendant initially lied to

officers. The State acknowledged that defendant had no criminal history or court supervision, as his misdemeanor DUI case was dismissed.

¶ 9 In turn, defendant argued that he did not pose a threat to any person or the community because "the alleged victim here falls within a very specific class of victim" that he "had very few opportunities to interact with," and the victim "is no longer available to be accessed" by him. Additionally, there were no allegations of threats to any other specific person, and the allegations against defendant did "not seem to provide a danger towards society in general." As to conditions of release, defendant suggested that conditions, such as a no-contact order with the victim, no alcohol, cannabis, or illicit drugs, and electronic monitoring or house arrest, would be sufficient to mitigate any threat posed by him. Defendant emphasized his lack of a criminal record and compliance with court supervision showed his willingness to comply with court orders.

¶ 10 The State responded that defendant could still pose a threat to "the next pregnancy that is unwanted that the woman isn't willing to be coerced into having an abortion." According to the prosecutor, if defendant is "willing to force medication in such a manner as this, well, that calls into every single question we may have about his morality and ability to comply with court orders."

¶ 11 The trial court found that the State met its burden of demonstrating that defendant committed a qualifying offense. As to the issue of consent, the court found that "defendant's words themselves speak volumes," as he said he "made the decision for her," which makes it "clear by defendant's own words that he ultimately made the decision." The court agreed with the State that if the abortion had been consensual, T.R. would have taken the pills as prescribed, rather than inserting them.

¶ 12 As to dangerousness, the trial court found that this crime was one of violence, as

defendant's actions led to the death of an unborn child. The court acknowledged defendant's lack of criminal history and lack of "any psychological history that would be indicative of violent, abusive, or assaultive behavior." The court found that defendant posed a threat to the victim, who "expressed a fear for her own safety," and added that it was "not clear to the Court whether or not the defendant *** has more than one relationship or not that might be cause for a pregnancy or some other concern for an unborn child." The court also found that defendant posed "a broader threat," which was "the threat related to the specific nature of this," as "this was the defendant taking matters into his own hands, going outside of societal boundaries to effectuate his belief of what should occur in the absence of consent, and that involves the taking of a life." As a result, defendant's conduct posed a "broader threat" in any "instance that defendant may disagree with the course of action." The court highlighted defendant's statement that he "helped make this decision for her," which "would at least indicate he knew that the main victim wasn't entirely clear which route she desired to go." Ultimately, the court found that the State met its burden of showing defendant posed a real and present threat to any person and the community.

¶ 13        As to conditions of release, the trial court acknowledged that "the bare allegation that defendant has committed a violent offense [is] not sufficient to establish the element that no condition or combination of conditions could mitigate the threat posed by this defendant." However, the court cited *People v. Romine*, 2024 IL App (4th) 240321, ¶ 20, where the court found that when there is "such a departure from the basic expectations of civil society, it becomes difficult to predict the defendant's compliance with court orders or even societal norms regarding the safety of others." The court found that this reasoning applied in this case, and that conditions such as home confinement or GPS monitoring would be insufficient because "[k]nowing where the defendant is does not negate any potential threat that the defendant would cause harm or

mitigate the danger." Additionally, conditions such as substance abuse or mental health evaluations would be inapplicable, as there was no indication defendant had a history of either. As a result, the court found that the State met its burden of showing that no conditions could mitigate the threat posed by defendant, and the court granted the State's petition for pretrial detention.

¶ 14 The trial court entered a written order granting the State's petition, noting that defendant's "actions created such a departure from all societal expectations and norms that it is impossible for the [court] to gauge his compliance [with] any conditions of release" and that defendant "admi[tted] that he made the decision for victim."

¶ 15 On September 10, 2025, the State charged defendant by indictment with three counts of intentional homicide of an unborn child (720 ILCS 5/9-1.2(a)(1), (2) (West 2024)) and one count of aggravated battery (720 ILCS 5/12-3.05(d)(2) (West 2024)).

¶ 16 On December 5, 2025, at a pretrial hearing, Judge J. Jason Chambers presiding, defendant proffered new information related to his pretrial detention. He proffered that because he was in custody and not working, his family was behind on the mortgage and car payments and were financially struggling. Defendant was willing to comply with any restrictions that the trial court would see fit to impose, including living with his mother, so that he could work and provide for his family while the case was ongoing. Additionally, his 17-year-old daughter was "getting life-saving medical treatment" and "had to be transported from the Bloomington area to Carle in Champaign, and [defendant] wants to be there to support his family." The court reaffirmed its prior ruling granting the State's petition for pretrial detention.

¶ 17 On December 18, 2025, defendant filed a *pro se* motion for relief under Illinois Supreme Court Rule 604(h)(2) (eff. Apr. 15, 2024), arguing that the State failed to prove all three prongs necessary to deny him pretrial release: that he committed the alleged offense, that he posed

a real and present threat to any person or the community, and that any threat could not be mitigated by conditions. He contended that he and T.R. "made the decision together with her own opinion and mine," and claimed never to have said that he " 'made the decision for her.' " He emphasized that he had no criminal history and there was no other indication he posed a threat to any person or group of people. He also argued that the State provided no evidence to prove that he would fail to comply with conditions of release.

¶ 18 On January 15, 2026, defendant's counsel filed a motion for relief, challenging the trial court's findings that defendant posed a real and present threat to any person or the community and that no conditions of pretrial release could be imposed to mitigate any threat. He contended that defendant had no criminal history, the pretrial services report did not demonstrate that defendant posed a significant risk to any person or the community, there was no evidence of any mental health issues that would make him a more significant threat, and his "past as a law abiding citizen demonstrates he is very likely to comply with any orders the Court would impose in this matter including no contact orders."

¶ 19 At a hearing on February 4, 2026, defense counsel indicated that he was proceeding on his motion for relief, not defendant's *pro se* motion. Counsel also indicated that he had new information. Specifically, counsel proffered that defendant and the victim "had various discussions about terminating pregnancy over a—quite a long duration; since almost the absolute beginning of the pregnancy," and T.R. "indicated that she had taken the Plan B pill, in an attempt to terminate the pregnancy, prior to any of this incident happening," and had "made at least one appointment at Planned Parenthood to terminate the pregnancy." T.R. additionally "expressed some conflicting emotions within herself about *** the least painful course as to approach a pregnancy termination, and ultimately came to the decision that terminating the pregnancy at home, with the assistance of

[defendant] utilizing medications, would be the right way for her to do that." Counsel emphasized that T.R. "did ask [defendant] to obtain medications, and was fully aware of the pregnancy and the fact that it was going to be terminated." The State responded that T.R. expressed that she would not be comfortable with defendant's release, and there were text messages "from the victim to the defendant actually asking questions regarding the fact that he had administered the pills to her without her consent."

¶ 20　Defense counsel reiterated his arguments regarding defendant's dangerousness and appropriate conditions of release. The trial court reaffirmed its previous ruling on defendant's pretrial detention and denied defendant's motion for relief.

¶ 21　This appeal followed.

¶ 22　II. ANALYSIS

¶ 23　On appeal, defendant reasserts his arguments that the trial court erred in finding that he poses a real and present threat and that there are no conditions or combination of conditions that could mitigate that threat.

¶ 24　Under section 110-6.1(e) of the Code, "defendants shall be presumed eligible for pretrial release." 725 ILCS 5/110-6.1(e) (West 2024). Once the State files a petition to deny pretrial release, the trial court must hold a hearing. 725 ILCS 5/110-6.1(a) (West 2024). The State must prove by clear and convincing evidence that (1) the proof is evident or presumption great that the defendant committed a detainable offense; (2) the defendant poses a real and present threat to the safety of any person, persons, or the community, based on the specific, articulable facts of the case; and (3) no condition or combination of conditions can mitigate the real and present threat to the safety of any person or the community, based on the specific facts of the case. 725 ILCS 5/110-6.1(e)(1)-(3) (West 2024). Under this framework, "the fact that a person is charged with a

detainable offense is not enough to order detention." *People v. Atterberry*, 2023 IL App (4th) 231028, ¶ 18.

¶ 25 Pursuant to a recent decision from the Illinois Supreme Court, "when the parties to a pretrial detention hearing proceed solely by proffer, the reviewing court is not bound by the circuit court's factual findings and may therefore conduct its own independent *de novo* review of the proffered evidence and evidence otherwise documentary in nature." *People v. Morgan*, 2025 IL 130626, ¶ 54. As the parties proceeded by proffer at the pretrial detention hearing in this case, we review the trial court's detention decision *de novo*.

¶ 26 In this case, there were multiple hearings on the issue of defendant's detention, and "we examine the basis for defendant's continued detention based on the record developed at any detention hearing, be it the original hearing or a subsequent review." *People v. Fuller*, 2026 IL App (4th) 251329, ¶ 36.

¶ 27                                      A. Dangerousness

¶ 28 Defendant asserts that the trial court erred in finding that he poses a real and present threat to any person or the community. When assessing dangerousness, the court may consider, *inter alia*, (1) the nature and circumstances of the charged offense, (2) the history and characteristics of the defendant, (3) the identity of the person whose safety the defendant threatens, (4) any statements made by the defendant, (5) the defendant's age and physical condition, (6) the age and physical condition of any victim, (7) the defendant's possession of or access to weapons, (8) whether the defendant was on probation or other similar condition at the time of the current offense, and (9) any additional factors bearing on the defendant's "propensity or reputation for violent, abusive, or assaultive behavior, or lack of such behavior." 725 ILCS 5/110-6.1(g)(1)-(9) (West 2024). However, "no single factor or standard may be used exclusively to order detention."

725 ILCS 5/110-6.1(f)(7) (West 2024). The court must weigh these considerations in light of—and ultimately base its finding on—"the specific articulable facts of the case." 725 ILCS 5/110-6.1(h)(1) (West 2024).

¶ 29    Here, the facts indicate that the nature and circumstances of the charged crimes included violence and led to the death of an unborn child. 725 ILCS 5/110-6.1(g)(1) (West 2024). According to the State's proffer, the victim did not consent to an abortion, but defendant, without telling her, placed one pill into a smoothie for her to drink and placed three pills inside of her vagina while performing oral sex on her, which T.R. said was unusual. The administration of these pills led to T.R. experiencing severe bleeding and cramping and ultimately miscarrying her seven-week-old fetus. Moreover, defendant admitted that he procured the medication from "a girl on campus," rather than from a medical professional. He additionally did not administer the medication as it would usually be prescribed. Defendant also disregarded the possibility that the medication would have adverse side effects or interactions with any other medications T.R. may have been taking. He thus ignored the possibility that his actions posed a potential threat to T.R.'s health, in addition to the life of her unborn child. Defendant allegedly also made the statement to police that he "made the decision for her," implying that she did not consent to an abortion. 725 ILCS 5/110-6.1(g)(4) (West 2024).

¶ 30    Based on these factors, we agree with the trial court that defendant posed a threat to T.R., who still expressed a fear for her life, and potentially any other possible sexual partners. The court also correctly found that defendant posed a broader threat to the community, as his actions demonstrated he was willing to "tak[e] matters into his own hands [and] go[ ] outside of societal boundaries to effectuate his belief of what should occur in the absence of consent," which, in this case, resulted in the death of an unborn child defendant did not want. Though defendant

claimed that T.R. consented to the abortion and that he did not tell the police he "made the decision for her," neither the trial court nor this court are required to accept that as true for purposes of determining whether pretrial detention is appropriate. See *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001) ("[A] fact finder need not accept the defendant's version of events as among competing versions."). Although defendant has no criminal history, is not known to have access to weapons, and was not on probation or parole or any type of supervised release at the time of the offense, these factors do not outweigh the threat posed by defendant. 725 ILCS 5/110-6.1(g)(2)(A), (7), (8) (West 2024).

¶ 31                                   B. Conditions of Release

¶ 32        Defendant next argues that the trial court erred in finding that there was no condition or combination of conditions that could mitigate the threat that he poses to any person or the community.

¶ 33        Courts may consider many factors in determining whether there are conditions that can mitigate a defendant's dangerousness, including (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the defendant"; (3) "the history and characteristics of the defendant," including "the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past relating to drug or alcohol abuse, conduct, history criminal history [*sic*], and record concerning appearance at court proceedings"; (4) "the nature and seriousness of the real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case"; and (5) "the nature and seriousness of the risk of obstructing or attempting to obstruct the criminal justice process that would be posed by the defendant's release, if applicable." 725 ILCS 5/110-5(a)(1)-(5) (West 2024). Another "relevant consideration is

- 13 -

whether there is reason to believe the defendant is likely to violate the conditions the court might impose." *Atterberry*, 2023 IL App (4th) 231028, ¶ 18. In each case, a court must conduct an "individualized" assessment of the propriety of detaining the defendant versus releasing him or her with conditions. 725 ILCS 5/110-6.1(f)(7) (West 2024).

¶ 34　　　　Importantly, " '[i]f the base allegations that make up the *sine qua non* of a violent offense were sufficient on their own to establish this element, then the legislature would have simply deemed those accused of violent offenses ineligible for release.' " *Romine*, 2024 IL App (4th) 240321, ¶ 15 (quoting *People v. Stock*, 2023 IL App (1st) 231753, ¶ 18). As a result, "a bare consideration of the defendant's dangerousness, with absolutely no consideration of possible conditions of release, cannot justify pretrial detention under the [Pretrial Fairness] Act's three-element framework." *Romine*, 2024 IL App (4th) 240321, ¶ 15. However, in *Romine*, this court stated:

> "Ultimately, the evidence of a defendant's charged conduct, even if it took place on a single occasion, may reflect such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders—or even societal norms regarding the safety of others—if the defendant is placed on pretrial release. The presumption in favor of pretrial release under the [Pretrial Fairness] Act does not obligate a trial court to release such a defendant in the hopes that his otherwise spotless record will negate the real and present threat he poses to the safety of the community as shown by the State's evidence." *Romine*, 2024 IL App (4th) 240321, ¶ 20.

¶ 35　　　　Upon reviewing the detention order *de novo*, we believe the trial court was correct that this statement from *Romine* applies to this case and militates against releasing defendant

pretrial. Defendant's conduct, as revealed through the various proffers in the record, "reflect[s] such a departure from the basic expectations of civil society that it becomes difficult to predict the defendant's compliance with court orders—or even societal norms regarding the safety of others— if the defendant is placed on pretrial release." *Romine*, 2024 IL App (4th) 240321, ¶ 20. Here, as discussed above, the nature and circumstances of the charged offenses were violent, as defendant's actions violated T.R.'s bodily autonomy and consent by penetrating her body with medication not prescribed by a physician and not properly administered, which resulted in severe bleeding and cramping and, ultimately, the death of T.R.'s unborn child. See 725 ILCS 5/110-5(a)(1) (West 2024). Defendant ignored the potential harm not only to the fetus he was intending to abort, but to T.R.'s health and safety, merely because he disagreed with her decision to continue the pregnancy. This indicates that defendant poses a "broader threat," as he was willing to "tak[e] matters into his own hands" and "go[ ] outside of societal boundaries to effectuate his belief of what should occur in the absence of consent" and ultimately kill an unborn child. Thus, defendant potentially poses a great threat to T.R. or another person who disagrees with or is in the way of his intended course of action. 725 ILCS 5/110-5(a)(4) (West 2024).

¶ 36        We recognize that defendant does not have a prior criminal history indicative of violent, abusive, or assaultive behavior, or any indication of mental health or substance abuse issues. However, based on the egregious nature of the offenses charged beyond the mere elements of the offenses, we agree with the trial court that conditions of release, such as electronic monitoring, GPS monitoring, or a no-contact order would not ensure T.R.'s safety or the safety of the community. Not only do defendant's actions and lies to police cast doubt on his ability to comply with conditions of release (see *Romine*, 2024 IL App (4th) 240321, ¶ 20), they also demonstrate that conditions of release would be insufficient to mitigate the threat posed by

defendant.

¶ 37 The ability of pretrial services to prevent harm is dependent on the ability of law enforcement officers to intervene once a violation of the conditions of release is detected, and, as the trial court pointed out, "[k]nowing where the defendant is does not negate any potential threat that the defendant would cause harm or mitigate the danger." This court has previously explained:

> "When coupled with a geographic limitation such as home confinement, electronic monitoring can help alert pretrial officers to a potential violation of that geographic limitation. But any condition of release must be appropriately measured to meet the danger presented in each case. Knowing that electronic monitoring might *detect* a failure to comply with conditions of release does not diminish concerns that a particular defendant appears to present a greater risk of noncompliance, especially if the consequences of noncompliance may be grave." (Emphasis in original.) *People v. Thomas*, 2024 IL App (4th) 240248, ¶ 26.

The same is true here. The offenses occurred in the home, and electronic monitoring is incapable of discerning what defendant is doing and preventing the situation from reoccurring.

¶ 38 Accordingly, the trial court did not err in finding that there were no set of conditions that could mitigate the threat defendant posed.

¶ 39                                III. CONCLUSION

¶ 40 For the reasons stated, we affirm the trial court's judgment.

¶ 41 Affirmed.